**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**The Bronx Defenders,**
on its own behalf, and

**Plaintiff One** and **Plaintiff Two** on behalf of themselves and all others similarly situated,

**Plaintiffs,**

**v.**

**Hon. Anne-Marie Jolly**,
Administrative Judge, New York City Family Court;

**John Doe,**
Deputy Administrative Judge, New York City Family Court;

**Eugene W. Hurley,**
Chief Clerk, New York City Family Court; and

**Ruth Whalen,**
First Deputy Chief Clerk, New York City Family Court;

in their official administrative capacities,

**Defendants.**

**COMPLAINT**

**No. 26-cv-4875**

## INTRODUCTION

1. This action seeks to preserve the status quo for drug testing in New York City Family Court. Under the status quo, family court judges may issue warrants authorizing drug tests of parents upon probable cause, and the Administration for Children's Services (ACS) may propose drug testing as part of the State's suggested criteria for reunifying parents and children. Drug testing is an everyday aspect of family court proceedings under this procedural framework.

2. This motion seeks to enjoin a separate courthouse drug testing program scheduled to begin in New York City Family Court on June 22, 2026. The program grants family court judges unfettered discretion to ask parents appearing in court to submit to on-the-spot drug testing. Parents who submit to testing will be required to urinate while a court employee watches.

3. There are no rules governing how judges will treat a parent's refusal. When courthouse drug testing was previously available (it stopped during the pandemic), judges routinely penalized parents who refused to test. Judges treated a parent's refusal as a sufficient reason to remove children from their homes or deny parents increased visitation. This unlawful practice coerces drug testing without valid consent in violation of the Fourth Amendment, and chills parents' access to court in violation of the First Amendment.

4. The reinstatement of courthouse drug testing thus poses a high risk of constitutional violations without serving any legitimate need. Instead, it creates a parallel system of suspicionless, coercive drug testing untethered from established legal standards or individualized findings, circumventing the process contemplated by state law.

5. Plaintiffs respectfully request that this Court maintain the status quo by enjoining family court officials, in their administrative capacities, from implementing the courthouse drug testing program.

## PARTIES

6. Plaintiff The Bronx Defenders (BxD) is a nonprofit organization that provides free legal services to tens of thousands of New Yorkers every year on a wide range of matters, including family defense. It is duly incorporated in New York State and has its principal place of business in the Bronx.

7. Plaintiffs One and Two are each parents who are currently respondents in child protective proceedings in New York City Family Court. They each face a credible threat of a coercive request to submit to courthouse drug testing at their next court appearance. They have filed a contemporaneous motion to litigate this case anonymously.

8. Plaintiffs sue each Defendant in their official capacity for their administrative acts.

9. Defendant Hon. Anne-Marie Jolly is the Administrative Judge for New York City Family Court.

10. Defendant John Doe is the successor to Hon. Peter J. Passidomo, the former Deputy Administrative Judge for New York City Family Court.

11. Defendant Eugene W. Hurley is the Chief Clerk for New York City Family Court.

12. Defendant Ruth Whalen is the First Deputy Chief Clerk for New York City Family Court.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over the Plaintiffs' claims under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3)–(4) (civil rights jurisdiction).

14. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district.

## FACTS

15. The Defendants seek to upend the status quo by instituting a courthouse drug testing program that poses a high risk of constitutional violations. The proposed program permits judges to ask parents appearing for court to submit to on-the-spot drug testing. The proposed drug testing procedure requires parents to be partially nude and urinate in front of court personnel. When this program was in place prior to the pandemic, judges regularly coerced parents into testing by treating a parent's refusal as a sufficient reason to remove children from their homes or deny parents increased visitation.

16. Courthouse drug testing thus poses a high risk of denying parents access to their children unless they submit to on-the-spot drug testing. Below, this section describes (1) the status quo for drug testing in family court proceedings for the more than five years; (2) the high risk that the proposed, additional drug testing program will result in constitutional violations from day one; and (3) why the Defendants know the risk of constitutional violations is a "reasonably foreseeable" consequence of reinstating the program.

### I. The Status Quo: The Family Court Act Authorizes Drug Testing Pursuant to Warrants or Disposition Orders

17. The Family Court Act establishes procedures for drug testing consistent with the Fourth Amendment and the fundamental rights at stake in child protective proceedings. Parents have a fundamental liberty interest in "care, custody, and management" of their children. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Child protective proceedings involve state intervention in this relationship, against the wishes of the parent, based on allegations of abuse or neglect. N.Y. Fam. Ct. Act §§ 1011, 1013(a). This case concerns a parent's access to their child

pending findings of fact on the state's allegations.[1] Specifically, this case concerns hearings to determine whether a child should be removed from home pending fact finding, N.Y. Fam. Ct. Act §§ 1027–28; and, if so, whether parents should be granted increased visitation, N.Y. Fam. Ct. Act § 1030.

18. The state often contends that the results of a parent's drug test are relevant to these determinations. State law specifies a procedure for the court to order a drug test: a warrant. Judges may order collection of urine in a reasonable manner "[u]pon motion of a petitioner or attorney for the child," and "only if the court finds probable cause that the evidence is reasonably related to establishing the allegations in a petition[.]" N.Y. Fam. Ct. Act § 1038-a. And, if the court holds a fact-finding hearing and determines that the parent abused or neglected the child, the court then has broad authority to require drug testing for the parent as a condition of visitation or returning the child home. *E.g.* N.Y. Fam. Ct. Act §§ 1054(c) (permitting an order setting conditions of visitation when child is placed with non-respondent parent or guardian); 1057(b) (requiring an order setting terms of supervision when a child is returned home).

19. Additionally, state law authorizes courts to enter orders directing ACS to arrange for services, like drug treatment, for the family as part of a broader plan for reunifying the family. N.Y. Fam. Ct. Act § 1015-a. State law also requires ACS to submit a "permanency[2] plan" every six months after the child is placed outside the home, which serves as the state's proposal for criteria the parent must meet to return the child home and end state supervision. N.Y. Fam. Ct. Act § 1089(c)(3). These services and plans often propose that the parent submit to random

[1] Child protective cases proceed from a petition alleging that the child has been subject to abuse or neglect, N.Y. Fam. Ct. Act § 1031; to fact finding on the petition and, if the petition is sustained, a disposition order setting a plan for meeting the child's needs and ending state supervision, N.Y. Fam. Ct. Act §§ 1051–52. This case concerns the rights of parents while a petition is pending, before the court makes findings of fact on the state's allegations.

[2] The Family Court Act refers to a permanent living arrangement for the child, without state supervision, as "permanency."

drug testing and/or participate in drug treatment. While these pre-disposition services and plans are a proposal from the state, not a court order, parents commonly accept this proposal and consent to testing in exchange for the state's agreement to increased access to their child. Parents who do not agree can reject the state's proposal and seek increased access to their child in court.

20. Thus, under the current system, whether drug testing occurs as the result of a warrant, a disposition order, or voluntary compliance with a service plan, the status quo allows for drug testing in child protective proceedings consistent with the Fourth Amendment and without chilling the right to be heard in court under the First Amendment. Under the status quo, drug testing is conducted outside the courthouse, by trained lab technicians in private areas at medical facilities or facilities specifically designed for sample collection.

21. New York City Family Court has operated under the foregoing authority, without courthouse drug testing, for more than five years since the pandemic.

## II. The Imminent Violation: The Proposed Drug Testing Program Will Coerce Parents into Testing and Chill Court Access

22. Courthouse drug testing would upend the status quo and pose a high risk of coercing parents into warrantless, nonconsensual drug tests, or else chilling parents' exercise of their right to court access. Below, this section describes (1) details about the proposed courthouse drug testing for people who submit to it; (2) the high risk that judges will order drug testing without valid consent from the individual being tested; and (3) the high risk this program will chill court access for parents seeking to keep their children home or increase visitation.

### A. Logistics of the Proposed Testing

23. On September 19, 2025, the Defendants (the New York City Family Court Administrative Judge, Deputy Administrative Judge, Clerk of Court, and First Deputy Clerk of Court) issued a memo describing the proposed reinstatement of courthouse drug testing, on the

letterhead of the "Office of the Administrative Judge." The program was delayed past its original implementation date of October 1, 2025, but on June 5, 2026, a court administrator announced that the program would be implemented starting June 22, 2026.

24. On information and belief, the September 19, 2025 memo itself has not been revised or adjusted, despite efforts by BxD and other counsel representing parents in Family Court to prevent its implementation, or at least minimize the high risk of constitutional violations posed by the program. Plaintiffs therefore understand that this memo and the associated attachments will dictate the nature and scope of the program when it goes into effect on June 22, 2026.

25. The memo was issued with fourteen attachments: a "Citywide Drug Testing Waiver for court users"; a list of substances with urine cutoff levels and detection times; and for each county,[3] substantively identical form orders to conduct drug screens, retest request forms, and record of appearance forms.

26. The memo proposes drug testing using a twelve-panel urine screen for illicit substances like cocaine and MDMA, common prescriptions like benzodiazepines and suboxone, and largely decriminalized recreational substances like THC and alcohol. The test shows substance use within a timeframe that differs by substance and frequency of use. Alcohol use can trigger a positive for more than three days. THC use can trigger a positive for up to thirty days.

27. Though the proposed program is characterized as voluntary, it contemplates tests carried out by court order, but sets no standard for how or when such court orders can issue. Judges can simply issue an "ORDER TO CONDUCT SUPERVISED ALCOHOL and/or DRUG SCREEN" to each parent who submits to testing. The template order, which judges are required

---

[3] The proposal does not include Richmond County.

to use, contains no space for judges to make any probable cause determination or any findings. The otherwise fillable PDF lists all twelve substances that the panel screens for and includes a checked box, which cannot be unchecked, next to each of the twelve substances. The form order requires the drug testing unit to provide written results for all twelve substances to the court by a specific date and time.

28. Upon issuance of the order, the parent is required to sign a "Citywide Drug Testing Waiver for court users." The parent is required to acknowledge that "The Honorable [Name], Part [X] has ordered me to provide a urine specimen for an alcohol and drug screening analysis." The parent is required to acknowledge that court staff will "supervise[]" them while they urinate, and the court will assign a staff member who shares their gender identity "[w]henever possible." Finally, the parent must acknowledge that court staff will withhold the results of the test from the parent, and the judge will inform the parent of the results in open court.

29. The drug testing protocol further requires parents to empty their pockets and display any items in their pockets to court staff.

30. The Defendants' memo contains no further restriction on how the drug tests are to be administered.

31. Both the form order and the waiver are nearly identical to the form order and waiver that were used under the prior courthouse drug testing program, which, as described below, resulted in rampant constitutional violations. The only difference between the prior program and the proposed program is that drug testing is now labeled as "voluntary," despite the absence of any measures to prevent prior coercive practices.

32. There is no reason to expect that test administration will differ from pre-pandemic practice.

33. Under prior practice, once the order was issued, a court officer escorted the parent to a waiting area where parents must sit, sometimes for over an hour, on a bench in view of other litigants, attorneys, and court personnel, until court personnel called their name. Once they were called back to test, parents were required to urinate with the door open in front of court personnel. Clients were embarrassed over urinating in these conditions, particularly when they were menstruating. There is no reason to believe that the proposed drug testing program will be any different.

34. Unlike the Family Court Act, which provides that an order to test must be initiated on motion of the government or attorney for the child, N.Y. Fam. Ct. Act. § 1038-a, the proposed drug testing program permits judges to ask for tests *sua sponte*. And unlike the Family Court Act, which requires a finding that drug test results are reasonably related to pending allegations of neglect or abuse, *id.*, the program imposes no limits on a judge's authority to ask parents to test. Judges may ask parents to test regardless of whether the allegations in the petition concern drug use, and regardless of whether the parent has had children in their care during the period covered by the test. Judges may ask parents to test even if the parent has submitted to other random drug tests showing consistent negative results. As discussed below in Section II.B, family court proceedings provide no remedy against a judge making an arbitrary or biased request.

### B. The Proposed Testing Program Poses a High Risk that Judges Will Order Tests Without Valid Consent

35. The only difference between the pre-pandemic program, which was stopped in 2020, and the program the Defendants are now set to implement is that drug testing is labeled as "voluntary." This is a change in name only. The Defendants have not made any substantive

changes to prevent the judges' prior coercive practices. The forms and procedures under the proposed program are nearly identical to the pre-pandemic program. The proposed program does not require judges to make probable cause determinations or any other factual findings to support drug testing orders. The proposed program does not mandate, or even suggest, alternatives to prior practice. The program contains no rule governing how judges elicit consent or treat a parent's refusal. If the program is implemented, the Defendants will be powerless to stop judges from continuing their prior practice of ordering tests without valid consent.

36. Because there are no meaningful differences between the proposed program and the pre-pandemic program, reinstating courthouse drug testing poses an extremely high risk that, immediately upon implementation on June 22, 2026, judges will continue their prior practice and order tests based on coerced consent. The judges' coercive practices under the prior program are described below.

37. Historically, judges who ordered courthouse drug testing did not make probable cause determinations or make any findings whatsoever in support of their drug testing orders.

38. Judges who ordered courthouse drug testing made a coercive "request" to parents appearing in court that they take a drug test.[4] As a practical matter, this "request" was a demand. For parents who refused, judges commonly presumed that a test would be positive and denied the parent's application on that basis. This means that when parents declined to test, judges ordered emergency removal of children from their homes, refused to allow increased visitation, or refused to allow children to return home.

39. After "requesting" that a parent submit to a drug test, judges typically presumed that parents who refused to consent would test positive, and treated a refusal to test as a

[4] Parents are generally required to appear in person for family court proceedings.

dispositive reason to deny the parents' requested relief. While the practice of treating that presumption as dispositive was often implicit, it was widespread and transparent enough that attorneys typically counseled their clients that a negative inference was the likely outcome if the parent refuses to test. In some cases, judges made this presumption explicit.

40. For example, judges simply ordered parents to test, abandoning any pretense of making it a request. In other cases, judges explicitly required parents to test as a condition of considering expanded visitation at hearings on emergency removal of children from home, signing stipulated agreements to increased visitation, or allowing a parent to move back home with their child. Judges also advised attorneys that they should withdraw applications to keep children at home if the parent was not willing to test.

41. These were not borderline cases in which the judge weighed the evidence, determined that the weight of the evidence was against the parent, and then told the parent that a negative drug test had the potential to tip the scales in the parent's favor. These were instances in which judges required parents to test as a threshold condition of considering what the parent had to say.

42. These instances reflect judges' typical practice when courthouse drug testing was available prior to the pandemic. While it was possible to successfully advocate for parents who submitted to testing and tested positive, it was nearly impossible to win relief for parents who declined to test.

43. Thus, when courthouse drug testing was in place, it was widely known to both family defenders and the parents they represented that refusing to submit to a drug test resulted in the denial of access to the parents' children.

44. Counseling parents about how to handle a judge's "request" to test was challenging. Defenders were required to explain that, even though the client has a right against unreasonable searches and the judge's request was ostensibly framed as a choice, the client did not actually have meaningful options if they wanted access to their children. Defenders therefore counseled any client that, if the client said no, the judge would presume that the client would test positive and the client's application for the child to come home or for increased visitation would almost certainly be denied.

45. There is an extremely high risk that, should the courthouse drug testing program be reinstated, the foregoing practices will continue. The proposed program uses substantially identical forms. It does not mandate, or even suggest, alternatives to the judges' prior coercive practices. It does nothing more than label as "voluntary" the same process that coerced nearly all parents into testing under the pre-pandemic program.

46. There are no alternatives available for parents who want to exercise both their right to withhold consent and their right to a meaningful hearing. Individual child protective cases do not provide the opportunity to challenge the existence of the courthouse drug testing program as an administrative matter. By the time a judge invokes that program by asking parents to test, the damage is done. There is no neutral party to whom the parent may appeal before deciding whether to comply. Parents who refuse to test lose their chance at increased contact with their children and do not have access to a timely appeal.

47. For parents who submit to testing, there is no recourse within family court to suppress the results. Suppression is not recognized as a remedy for a Fourth Amendment violation in family court proceedings.

48. Experience under the pre-pandemic program also shows that, in the absence of any meaningful recourse for parents, some judges will make biased and harassing requests. On many prior occasions, judges asked parents to test where there was no allegation of substance use against them, or where the parent was not seeking increased contact with their children. Judges asked parents to test despite the fact that the parent had submitted to multiple recent tests in a treatment program. Judges issued orders to test directly to the parents, without asking their attorneys first whether the parent would consent. Each of these examples is symptomatic of the underlying problem that courthouse drug testing gives judges unfettered, unreviewable discretion to ask parents to test, and is representative of requests that will re-start once the program is reinstated.

49. These examples are also consistent with the broader culture of practice in New York City Family Court, where there is documentation of both racial bias and inconsistency in basic professionalism among judges and courthouse staff.

50. There are well-documented problematic practices in family courts across New York State, some of which are relevant to the risks posed by reinstatement of courthouse drug testing. Family court judges too often act unprofessionally toward litigants by yelling at or interrupting them and exhibit racial bias, most severely against Black families. Family court judges are also under extraordinary time pressure created by high case volumes.

51. The New York State Senate Judiciary Committee, together with the Committee on Children and Families, recently issued a joint report affirming these findings, and finding further

that family courts function like a "cattle call" that provides families with a "second-class system of justice."[5]

52. Recommendations for remedying these issues include increased compensation for family court judges to ensure high quality on the bench, expansion of mechanisms for holding judges accountable for biased or inappropriate treatment, and protection from retaliation for litigants who complain of mistreatment. The underlying issues prompting these recommendations have not been resolved in New York City Family Court.

### C. The Proposed Testing Program Poses a High Risk that Judges' Practices Will Chill Access to Court

53. As discussed above, if courthouse drug testing is reinstated, there is a high risk, supported by prior practice, that judges will order parents to submit to drug tests without valid consent. This practice deters parents with legitimate arguments from appearing to present their claims in court.

54. Again, when courthouse drug testing is in place, it is widely known to both family defenders and the parents they represent that refusing to submit to a drug test means denial of access to parents' children. Attorneys must counsel clients about this reality to prepare them to appear in court, and counsel them again—if the judge allows it—when the judge asks the client to test.

55. In many cases under the pre-pandemic program, judges warned parents to withdraw applications for return of their children if they were not willing to submit to testing, and parents complied, withdrawing otherwise meritorious applications to return their children home.

---

[5] N.Y. State Senate Cmte. on Judiciary & N.Y. State Sen. Cmte. on Children & Families, The Crisis in New York's Family Courts 3 (Feb. 2024), https://www.nysenate.gov/sites/default/files/admin/structure/media/manage/filefile/a/2024-02/2.12-family-court-hearing-report-w-graphics-1.pdf.

56. Experience also shows that some clients submitted to testing, only to subsequently decide that they do not want to bear the indignity and left the courthouse altogether. These parents lost their applications to keep their children home pending factfinding or expand visitation.

## III. The Defendants Are Disregarding Known Risks of Courthouse Drug Testing

57. Administrative matters in New York City Family Court are determined by the Office of the Administrative Judge, which consists of the four Defendants: Administrative Judge, Hon. Anne-Marie Jolly; the Deputy Administrative Judge, formerly Hon. Peter J. Passidomo; the Chief Clerk, Eugene W. Hurley, and the First Deputy Chief Clerk, Ruth Whalen.

58. These administrators convene quarterly to update court personnel and practitioners on administrative matters, and they also occasionally hold ad hoc meetings with "agency heads," directors of publicly funded family defense practices, to discuss specific projects.

59. It is reasonably foreseeable that, if the Defendants reinstate courthouse drug testing, judges will order drug tests without valid consent. While the Defendants are well aware of judges' rampant coercive practices under the prior program, none of the Defendants have taken meaningful action to prevent them. The Defendants' actions have only confirmed that further constitutional violations are reasonably foreseeable.

60. First, the Defendants' memorandum reinstating the program inserts language on voluntariness that, ironically, highlights a parent's lack of meaningful choice. The memo simply states: "Parties must voluntarily consent to supervised drug testing." It is silent on procedures for offering parents a choice, confirming that parental decisions are truly voluntary, or protecting the rights of parents who decline to test. At the same time, the memo recycles form orders and a

form "waiver" from the prior program, which retain substantially similar language and characterize drug testing as pursuant to a court order.

61. Second, while the Defendants characterize courthouse drug testing as voluntary, the Defendants have been repeatedly warned[6] that judges are likely to continue their prior coercive practices.

62. Judge Jolly has also acknowledged these concerns. In response to family defenders' questions about how the reinstated program would end old habits, Judge Jolly has told defenders that, while she would be unhappy if judges continue coercive practices, she cannot control what other judges do. Judge Jolly has also advised defenders to come speak with her about coercive requests when they happen, but she has not modified the courthouse drug testing program to prevent coercion before it occurs. The Defendants have not instituted any guidance on how to avoid prior coercive practices or otherwise ensure judges are eliciting valid consent.

## IV. Courthouse Drug Testing Injures Each of the Plaintiffs

63. All parents who are respondents in child protective proceedings are at risk for courthouse drug testing. Regardless of the event that precipitates ACS's investigation, if ACS files a petition, the agency is alleging that a parent has abused or neglected a child. Abuse and neglect is by definition conduct that causes or risks harm to children. Based on The Bronx Defenders and other family defenders' experience representing parents in family court, it is exceptionally rare for a parent to have specific intent to harm a child. Therefore, even if the

---

The Defendants met with the directors of publicly funded family defense practices, called "agency heads," in two ad hoc administrative meetings to discuss reinstatement of the program. The first meeting was in September 2025 to discuss reinstatement, then scheduled for October. Predictably, the directors shared significant concerns about the coercive nature of testing and the minimal evidentiary value of the results. In response, the Defendants delayed the program by a week, then tabled it completely. In April 2026, the Defendants set a meeting with the same group of directors and informed them that the program would be reinstated as originally planned in May 2026, later pushed to June 22, 2026.

initial petition does not include allegations of drug use, it is not uncommon for judges to request that parents submit to drug testing because judges infer that any alleged behavior may be explained by drug use.

64. Plaintiffs 1 and 2 are at substantial risk of a judge asking them to test. There have been no findings of fact regarding the Plaintiffs' petitions. Each Plaintiff has one or more of their children removed from their care. They are similarly situated to other members of the putative class described below.

65. The reinstatement of courthouse drug testing will also negatively affect the core business activity of BxD's Family Defense Practice: providing clients with high-quality representation in child protective proceedings.

66. Reinstating courthouse drug testing will require a considerable effort to retrain staff. Many BxD attorneys and advocates were hired after the pandemic, and they have not practiced in family courts where judges can seek on-the-spot drug testing from our clients. BxD staff will need training on historical courthouse drug testing practices, how to counsel clients before they come to court, how to handle a judge's request to test, how to counsel a client in the moment, how to build arguments to contextualize a positive result or a client's refusal, and how to prevent adversaries from using the test results in other proceedings. BxD will need to prepare its attorneys and advocates to anticipate what steps to take should a client express a desire not to come to court based on the existence of courthouse testing.

67. BxD will also need to train its attorneys and social workers to conduct an assessment of each client's potential to produce a false positive based on their medications and diet. While BxD currently provides staff some training on identifying false positives when a test result is unexpected, this training is premised on collection of samples by trained lab technicians,

who generally elicit information about food and medication that may trigger a false positive to flag potential errors before BxD clients test. Courthouse drug testing does not involve this preventive screening. BxD staff will need to screen clients for potential false positive triggers before every court appearance, and even at the intake appearance immediately after meeting the client, which is when the placement of children is determined and judges are likely to request parents test for drugs.

68. To provide effective training and strive for the highest quality representation, BxD leadership will need to build expertise and spend time on the nature and limits of courthouse drug testing. BxD leadership is currently investigating the reliability of the brand of courthouse tests, and starting to train staff on the science of false positives and drug testing with these particular tests that could be administered by lay court officers in a non-medical environment.

69. BxD will need to assign social workers to sit with clients while they wait for testing to reassure them, answer their questions, and prevent or bear witness to any problematic interactions between the client and courthouse staff.

70. BxD will need to pay for retests of potential false positives in all appropriate cases.

71. Finally, BxD will need to monitor the program and document anticipated constitutional violations. BxD leadership has already had, and will need to continue to have, meetings with court administrators about the program and the impacts BxD clients and attorneys are experiencing once the program begins.

72. These needs will require more staff hours and more resources for BxD to serve the same amount of clients.

73. BxD has existing close relationships with its clients. BxD currently represents them in family court, and BxD is an effective proponent of its clients' rights. BxD's interests are closely aligned with its clients because it is BxD's job to advocate for its clients' rights in family court, and courthouse drug testing will violate these rights.

74. BxD's clients are dissuaded from seeking relief in their own name. They are concerned that they will be stigmatized for challenging the program, including that the judges and parties in their own case will prejudge and determine their ability to have their children in their case on their opposition to this program (essentially, they will be assumed to be using drugs and that will be the determinative factor in whether they should have their children). Parents who oppose the program will draw attention to themselves and prompt judges to request that they test. Parents who oppose the program would be exposed as presumed drug users.

75. BxD takes on close to one hundred new family defense clients each month. BxD represents new clients in approximately a dozen proceedings each week concerning emergency removal of children from their homes. This number does not include cases where existing clients must oppose emergency removal of their children sought after a petition has been filed or clients who seek increased visitation.

76. If courthouse drug testing is reinstated, there is a high risk that parents will submit to testing because, if they refuse, the judge will automatically deny their request to keep their children at home, return their children home, or increase visitation. There is also a high risk that judges will advise parents that they should withdraw claims for access to their children if they are not willing to consent to testing, and parents will do so.

## CLASS ACTION ALLEGATIONS

77. The parent class representatives bring each claim on behalf of a class consisting of all respondents (parents and guardians) who are the subject of pending petitions in child protective proceedings in Bronx, Brooklyn, New York, or Queens County Family Court, and who are not incarcerated.

78. The members of the class are so numerous that joinder of all members is impracticable. There are well over a thousand members of the putative class at any given time, and the class is constantly in flux as new petitions are filed or petitions are resolved.

79. The class representatives' claims are typical of class members' claims, as all members of the class share identical challenges to courthouse drug testing.

80. The class representatives will fairly and adequately protect class members' interests. They have retained competent counsel with extensive experience litigating class actions and civil rights actions in federal court. The class representatives have no known conflicts with the interests of the class.

81. Common questions of law and fact exist as to all members of the class. These questions are detailed in the accompanying motion for class certification.

82. By reinstating courthouse drug testing, the Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## CLAIMS FOR RELIEF
## Under 42 U.S.C. § 1983

### Count One: Unreasonable Searches
### In Violation of the Fourth Amendment
### Against All Defendants

83. Plaintiffs incorporate the foregoing allegations.

84. The Fourth Amendment protects parents from unreasonable searches by child welfare authorities. Urine tests for drugs are searches.

85. The Defendants intend to implement a courthouse drug testing program in New York City Family Court.

86. The proposed testing program explicitly authorizes warrantless urine tests for drugs on parents appearing in court for child protective proceedings. Warrantless searches are presumptively unreasonable.

87. There is a high risk that judges will order these warrantless searches in the absence of any applicable exception to the warrant requirement. There is a high risk that family court judges will order courthouse drug testing without valid consent.

88. Judges will coerce consent by treating a parent's refusal as a sufficient reason to authorize removal of children from their homes or deny parents increased visitation, in violation of state law.

89. The government has no special need making the warrant requirement impracticable.

90. The proposed program requires parents to urinate in front of court officers. The program requires court officers to withhold the results of the test from the parent and their counsel. Parents must learn the results of their drug test through an announcement by the judge in open court.

91. The drug test results have minimal evidentiary value for child protective proceedings.

92. It is reasonably foreseeable to the Defendants that judges will use the courthouse drug testing program to order drug testing without valid consent. The Defendants are

nevertheless reinstating the program with deliberate indifference to the known risk of unreasonable searches.

93. Plaintiffs seek injunctive and declaratory relief against all the Defendants preventing violation of their Fourth Amendment right against unreasonable searches and preserving the status quo.

**Count Two: Chilling Access to the Courts**
**In Violation of the First Amendment**
**Against All Defendants**

94. Plaintiffs incorporate the foregoing allegations.

95. Parents have a constitutional right of access to family court. Parents have a fundamental right to the care, custody, and management of their children, and have meritorious claims to oppose state interference in the parent/child relationship.

96. The proposed courthouse drug testing program requires parents to urinate in front of court officers.

97. The proposed program requires court officers to withhold the results of the test from the parent and their counsel, and instead, require them to wait and learn the results of the test through an announcement by the judge in open court. There is no legitimate reason to require parents to learn and respond to drug test results in this manner.

98. The proposed program is hostile toward parents.

99. There is a high risk that the proposed program will hinder parents from pursuing their valid claims to increase contact with their children.

100. It is reasonably foreseeable to the Defendants that the proposed courthouse drug testing program will hinder parents from pursuing valid claims to increase contact with their

children. The Defendants are nevertheless reinstating the program with deliberate indifference to the known risk of chilling the right to court access.

101. Plaintiffs seek injunctive and declaratory relief against all the Defendants preventing violation of their First Amendment right to court access and preserving the status quo.

## REQUEST FOR RELIEF

Plaintiffs request that the Court enter the following relief:

1. Certify the proposed class, or, alternatively, certify a modified class bringing this action within the scope of Rule 23 of the Federal Rules of Civil Procedure;

2. Permanently enjoin the Defendants from reinstating the courthouse drug testing program;

3. Declare that "consent" to courthouse drug testing under typical practice is coerced, and the resulting warrantless drug test is an unreasonable search in violation of the Fourth Amendment;

4. Declare that courthouse drug testing under typical practice is a hostile process that hinders parents from asserting valid legal claims in violation of the First Amendment;

5. Award Plaintiffs attorneys' fees, costs, and disbursements under 42 U.S.C. § 1988; and

6. Grant any further relief the Court deems just and proper.

Respectfully submitted,

s/Trisha Trigilio
Trisha Trigilio
Anne Venhuizen
Jesse McGleughlin**
Kyle Hogan*
**The Bronx Defenders**
360 East 161st Street
Bronx, New York 10451

Tel: (347) 302-2797
ttrigilio@bronxdefenders.org

s/ Kathleen A. Reilly
Kathleen A. Reilly
Alexander Weaver
**Arnold & Porter**
250 West 55th Street
New York, New York 10019-7450
Tel: (212) 836 7450
Kathleen.reilly@arnoldporter.com

Counsel for Plaintiffs

*Law graduate practicing under supervision of Trisha Trigilio.

**Application for admission forthcoming.